*MONCURE, P.,
-delivered the opinion of the court.
This case has been argued with great ability by the counsel on both sides. We listened to the argument very attentively and anxiously, have considered it very maturely, and have agreed in an opinion in the case; which opinion we will now proceed to deliver. We will dispose of the several assignments of error in the order in which they are made in the petition for a writ of error in the case:
1. The first assignment of error is: that the hustings court erred in overruling the petitioner’s several motions to quash the original, and each of the other writs of ve-nire facias,' issued on the trial of the case, which constitute the subjects of his first, second and third bills of exceptions referred to in the said petition.
In the first bill' of exceptions, it is stated that on the trial of the cause, before the jurors were called, the prisoner moved the court to quash the writ of venire facias, and the return thereon, for errors and irregularities appearing thereupon, and in this connection, objected to the list furnished by the judge to the sergeant of the jurors to be summoned under said writ, on the ground that said list was not made according to law. Then follow in said bill a copy of said writ and the return thereon and the said list and certificate of the clerk thereto, which need not be here repeated. The venire facias commanded the sergeant of the city of Richmond to “cause to come before the judge of the hustings court of the city of Richmond, at the court-house thereof, on the 17th day of April, 1879, twenty-four persons of your corporation, to be taken from a list furnished by the judge of said court, and who reside remote from the place where the felony was committed, and who are qualified in other respects to serve as jurors, of
which John E. Poindexter stands *indicted,” &c. But the court overruled said motion to quash, and said objection to said list, and directed the jurors to be called who were summoned under the same; to which rulings of the court the prisoner excepted, and tendered his said bill of exceptions; which the court signed, sealed and enrolled accordingly.
The. said court manifestly did not err in the rulings, or any other of them, referred to in the said first bill of exceptions.
In the second bill of exceptions, it is stated that on the trial of the cause, before the jurors summonedunderthewritofvenire facias which issued on the 17th day of April, 1879, the prisoner by his counsel moved the court to quash the said writ of venire facias and return thereon, for errors, defects and irregularities apparent thereon. The said writ and return thereon are inserted in the said second bill. The said writ commanded the said sergeant, to “cause to come before the judge of the hustings court of the city of Richmond, at the courthouse thereof, on the 18th day of April, 1879,.two hundred persons of your corporation, to be taken from a list furnished by the judge of said court, and who reside remote from the place where the felony was committed, and who are qualified in other respects to serve as jurors, of which John E. Poindexter stands indicted, &c. And in this connection it is certified (in the said second bill), that the list furnished by the judge to the officer, in conformity.to the direction of said writ, contained the names of two hundred persons to be summoned as aforesaid. But the court overruled the said motion to quash; to which decision of the court the prisoner excepted, and tendered his said bill of exceptions thereto, which was .signed, sealed and enrolled accordingly.
*The objection made to the venire facias set out in the second bill of exceptions is: that it contains the words, “and who reside remote from the place where the felony was committed,” which are not in that part of the act of the general assembly under which the said venire facias was issued; and it is contended, that the insertion of the said words in the said venire facias, rendered it fatally defective.
The act in question is section 4, on page 340; of the Acts of Assembly of 1877-78; which, or so much of it as need be here stated, is as follows: “In a case where the punishment may be death, the writ of venire facias shall require the officer to summon 24 persons in the manner provided in section three of this chapter; and in any case of felony, where a sufficient number of jurors for the trial of the case cannot be had from those summoned and in attendance, the court may direct another venire facias, and cause to be summoned from the bystanders, or from a list to be furnished by the court, so *595 many persons as may be deemed necessary to complete the jury.”
The venire facias which is first to be issued under the said fourth section is expressly required to contain the words: “residing remote from the place where the of-fence is charged to have been committed.” The direction contained in the same section, for the issuing of another venire facias in the same case, if necessary, follows immediately, and without a full stop, but only a semicolon, the direction in regard to the issuing of the first venire facias. It does not repeat the words in question expressly used previously in the same section. But if it does not imply that the persons to be summoned under the subsequent venire facias are to possess the same qualification in that respect with the persons directed to be summoned under the first venire facias, it certainly does not imply that they are not to possess *such qualification. The words of that part of the section are, “the court may direct another venire facias, and cause to be summoned from the bystanders, or from a list to be furnished by the court, so many persons as may he deemed necessary to complete the jury.” If it be not implied by these expressions, (and we do not mean to say that it is), that the jury is to be completed of persons possessing the same qualification in regard to residence prescribed as to persons directed to be silmmoned under the first venire facias, can the contrary be thereby implied? Can remoteness of residence from the place where the offence is charged to have been committed, be any valid ground of objection to a person summoned from the bystanders, or from a list to be furnished by the court for the purpose of completing the jury? In making out a list of persons under the said fourth section, from which are to be summoned so many persons as may be deemed necessary to complete the jury, as aforesaid, is it any just ground^ of objection to a person put upon that list, that he resides remotely from the place where the offence is charged to have been committed? If the court in making out the list, has to choose between persons residing remotely from the said place or in the immediate vicinage, is it any just ground of objection, to the action of the court in that respect, that it pursued the declared policy and command of the law in regard to the first venire facias, and chose the persons residing remotely from the said place? Or if the officer, in summoning persons named in said list, is influenced in making his selection, by the same policy and command of the law, can it be a just ground of objection to his conduct that he did so? In this case, the court named two hundred persons, exactly the number required to be named in the list, and the officer was required to summon the whole number named; so that he had to *make no selection, and the cuestión therefore does not arise as to him. Whether the court, in making out the list, made any such selection, or had any opportunity of doing. so, the record does not inform us. But it is a wholly immaterial question, and it is no valid ground of objection to the second venire facias aforesaid that it contains the words: “and who reside remote from the place where the felony was committed.”
The said court therefore manifestly did not err in its rulings referred to in the said second bill of exceptions.
In the third bill of exceptions, it is stated, that on the return of the sergeant upon the two writs of venire facias which were issued in this cause on the 18th day of April. 1879, directing him to summon jurors from Alexandria and Fredericksburg, and before calling the jurors under said writs, the prisoner by his counsel moved the court to quash the said writs, and each of them, and challenged the array of jurors summoned under the same, upon the grounds that the said writs were issued without authority of law and are also illegal and void for errors, irregularities and imperfections upon the face thereof and the returns thereon. Then follow, in said bill, a copy of said writs and the returns thereon. In one of the said writs the sergeant was commanded to cause to come before the judge of the hustings court of the city of Richmond, at the courthouse thereof, on the 21st day of April, Í879, twenty-five persons of the city of Alexandria, each one of whom is twenty-one years of age. and who are in other respects qualified to serve as jurors, and who reside remote from the place where the felony was committed of which John F,. Poindexter stands indicted, to recognize on their oaths whether the said Poin-dexter be guilty of the felony aforesaid or not,” &c. The other of the said two writs was to the same effect and in the *same form, except that it applied to Fredericksburg, instead of Alexandria. These writs were duly returned by the said sergeant or his deputy, with the names of the persons endorsed thereon who had been summoned by him, in accordance with the said writs respectively; it being stated in the returns on said writs that the said persons were so summoned by him. But the court overruled the said challenge and motion to quash, and directed the call of the jurors under the said writs to be proceeded with; to which opinion and decision of the court, the prisoner by his counsel excepted, and tendered his said bill of exceptions; which the court signed, sealed and enrolled accordingly.
The said court did not err in the rulings on any of them referred to in the said third bill of exceptions. The said court was authorized by law to order the said writs to be issued when it did, and the said writs were legal and valid, in form 'and substance. The only objection made to them seems to be, that they command the sergeant to summon persons as jurors “who reside remote from the place where the felony was committed, of which John E. Poindexter stands indicted.” Tf these words can have any meaning or effect, in the connection in which they are here used, we have already shown that they are in accordance with the declared policy and spirit of the law, and are there *596 fore unobj ectionable. If they have no meaning or' effect in the 'said connection; if all persons residing in Alexandria and Freder-icksburg respectively, reside remotely from the place where the said felony was committed, then all such persons were equally competent and eligible in that respect to serve as jurors iri the trial of the said felony, and the words in question are wholly useless, and do not at all affect the other portions of the said writs, which must have precisely the same effect as if the said words had not been ^inserted in the writs. The maxim, utile per inutile non vitiatur, applies to such a case.
We think there is nothing in Wash’s case, 16 Graft. 530, or in Whitehead’s, case 19 Id. 640 — which cases were cited and relied on by the counsel for the plaintiff in error — which is in conflict with anything that has been said in this opinion; and that it is unnecessary to state here, the points or any of 'them decided in those cases or either of them.
2. The second assignment of error is in these_ words: “The admission by the court of evidence of the fact, that a prior difficulty had occurred between your petitioner and said Curtis on the same morning on which the killing of the latter by the former occurred, which forms the subject of the indictment, and for which latter alone your petitioner was legally on trial."
This assignment of error depends upon the fourth and fifth bills of exceptions; the substance of which so far as material to •the present enquiry will be now stated.
In the fourth bill of exceptions it is stated, “that on the trial of the cause, the Commonwealth introduced a witness by the name of Allen M. Eyon, who testified as follows:” Then follows, in the said bill, the testimony of the said witness, the substance of which, so far as seems to be material to be set out here, is as follows: “I was present at the shooting of Charles C. Curtis by the prisoner. It occurred between 11 and 12 o’clock, in the morning of the 3d of March, 1879, at 'Childrey’s factory, corner of 24th and Main streets, in the city of Richmond.” The witness then proceeded to describe the situation of the office in which the shooting occurred. “The prisoner was a clerk in my office. I was sitting in the front office with my back to a partition, near the door leading into the next office, where Mr. Poindexter was. In that partition there is *a window. I saw the two gentlemen enter at the Main street entrance. Young Mr. Wilson and I were in there. He was in the corner next the street. I said, ‘How are you, McGuire?’ Curtis came in first. McGuire asked where Poindexter was. I nodded my head to the door leading to the inner office and said, ‘He is in there.’ The window it about four feet high. There is no glass to it, but a frame for a wire screen, but it was not up. You can converse from one room to the other and can easily hear what is going on. I was sitting there, as I have described, and I saw Curtis go up to the window, almost immediately after they entered, and ask Poindexter a question, which I did not understand at the moment; and Poindexter replied, ‘You can’t get one.’ Curtis immediately passed across my feet, through the door, and into the room where Poindexter was. Some remark attracted my attention, I don’t know what it was; and I jumped up and went into the inner office. Mr. Curtis had stopped, and was standing with his stick upraised. Mr. Poindexter had the pistol in his hand, and said, ‘If you strike me with that stick, I will shoot you.’ McGuire then said, ‘Hit him, hit him; knock him in the head, knock him in the head.’ Curtis immediately advanced and struck him. Poindexter firing, the striking and firing continuing, until Curtis fell. I was standing against the door.” Witness was shown the pistol, and described the wounds in the body and head of the deceased. He stated that Curtis’back was to him, about eight feet distant. That Poindexter was facing towards witness, and seven or eight feet further from witness than was Curtis. Witness also described the location "of the furniture in the room. Both of the rooms are about fifteen feet long and eleven feet wide. The width of the room, in the clear, was stated to be about six feet *one and a half inches between two long desks running along its sides.
The witness was then asked by the Commonwealth’s attorney the following question:
Had you any conversation on that morning with the prisoner, concerning any difficulty between himself and the deceased, occurring on that morning; and -if so, what was it?
To which question and any answer thereto the prisoner by his counsel objected. And thereupon the Commonwealth’s attorney announced that he intended to follow the- question up by evidence that the prisoner had conspired with another, on the morning of the homicide, to whip the deceased. Notwithstanding which the prisoner still objected to said question and any answer thereto. Nevertheless the court overruled the objection, and permitted the witness to answer the question, which answer is in substance as follows:
Answer. “I had; soon after getting to my office, say about 9)4 o’clock A. M., he (the prisoner) told me, that he had had a difficulty with a young man up town by the name of Curtis, at Wingo, Ellett & Crump’s store, corner of 10th and Main streets, and that he had horsewhipped him. I think I asked him what for. He said that he had insulted a young lady, friend of his, that went in there to see about some shoes, and that she had carried a pair of shoes there to have something done to them; that on taking them out of the bundle, he had remarked on the size of them, and said that it was a very pretty little foot that went in it. Some similar remark was repeated several times, and she had asked him, please to make no remarks on her foot, to wrap them up and give them back to her; that then Curtis had repeated it was a pretty little foot and asked her to stick it out and let him look at it, or let him see it; and some similar remark, and she paid *him. She laid down the money to pay what she owed him, and started to the *597 door, and as she got near the door he remarked, she hadn’t left the right change. She asked how much mistake she had made, and he said she owed one dollar and seventy-five cents and had only paid seventy-five cents. She came back to give him the additional amount, and he turned to her and remarked, ‘O yes, here it is,’ opened his hand and showed her the other dollar. They then went to the phaeton, and he helped her in, and in putting her in squeezed her arm. That is about all he said. Half an hour later had another little conversation with the prisoner. I went out into the yard or somewhere, and coming back I said, 'John, the first time you go up town, that young man will be shooting you, if you don’t look out.’ Said he ‘O no, that is all settled; there’ll be no more of that.’ That’s about all I believe.”
To which ruling of the court, in permitting the said question to be asked and said answer to be given, the prisoner excepted, and prayed that his said bill of exceptions (to-wit: the fourth), might be signed, sealed and enrolled, which was done accordingly.
Tn the fifth bill of exceptions it is stated in substance, among other things, as follows, to-wit: that after the proceedings set forth in said bill of exceptions No. 4, which are here referred to as if here repeated at large, the said witness, Allen M. Tyon, proceeded with his testimony, substantially as follows:
He produced a diagram of the room in which the homicide occurred, which is annexed to his evidence as part thereof. He explained the location of the outer and inner offices, and the position of the parties and the furniture, as appears on said diagram. “I suppose if the door had been shut it would have touched my back.” “Poindexter’s face was towards me, but *1 cannot say that he saw me. I did not see Mr. McGuire in the inner office at all.” “The distance from where Curtis, the deceased, stood talking to Poindexter at the window to the door leading to the rear office, is eighteen feet; from where Poindexter stood to the same point, is fifteen feet. When Curtis fell, his head struck one of the stools as I show in the diagram. I advanced to him and reached out my hand as if to take hold of him. I saw that he was shot in the head, and started immediately for a doctor.” “As he fell,” “the stick dropped from his hand and lay by his right side. When Curtis fell, Poin-dexter said, ‘My God, I did not want to shoot the man; can’t some of you do something for him.’ I heard him say this just as I was going for the doctor. I have no doubt of my own position. One of the balls went through my sleeve and struck the door. I found four balls in Curtis’ body. I did not understand at the time what Curtis said; it came to me afterwards that he said, T want an apology.’ I thought at first he said something about ‘policy.’ There was some expression, I don’t know what it was, before I went in. Curtis had haulted. Just as I came in, Poindexter said, ‘If you strike me with that- stick I’ll shoot you; I’ll shoot you.’ Curtis said, T am unarmed.’ McGuire said, ‘Hit him; hit him; knock him in the head,’ or ‘kill him; kill him.’ I rather think the expression was, ‘Hit him,’ I am positive. I know he used the expression ‘Knock him in the head.’ When that was uttered, I thought McGuire was in the outer office. I did not go up to Curtis because I was right in the line of the pistol. When I first saw Poindex-ter he was near the end of the room. He had retreated from the window. I could not see him at the window, but if he was there, as McGuire says he was, he had fallen back from that position towards the end of the room by a window with bars *over it.” “I thought nothing of the size of the combatants while the conflict was going on. When I saw Curtis’ bosom exposed, I thought he was a tolerably good sized man. He was, in my judgment, a larger man around the chest than Poindexter. The blows were delivered with rapidity and force. No shot was fired until McGuire’s exclamation, and Curtis advanced and struck Poindexter. I feel positive Curtis struck first; cannot say how often he struck. The blows and shooting were in rapid succession. Poindexter could fall back no further after he warned him. He had then fallen back as far as he could. The whole thing was very rapid. I saw no wavering of blows on the part of Curtis until he fell. I could not have told he was struck until then. Poindexter has lived with me over six years. I never looked upon him as a robust man. I looked upon him as a delicate, and as a quiet and peaceable man. Poindexter was a taller man than Curtis, but my impression was that Curtis was the larger man. Curtis had room for a pretty free use of the stick. Used it overhand. Have seen the prisoner with a pistol before on occasion of his going to a farm belonging to him about Bosher’s dam, eight or nine miles above the city. He visited that place after he was done his daily work with me. Generally went up in the evening, and I believe on such occasions carried a pistol. I do not identify the pistol as the one I had ever seen before. The prisoner was not going to Bosher’s dam that morning. Do not know I ever saw it in the desk. PIave gone in their often.” Witness was shown the pistol with seven chambers, six empty and one loaded. The witness said “he did not really know how many shots were fired, and that he did not know which end of the stick Curtis held. The rapidity of the firing was illustrated by snapping his thumbs, at intervals of about two seconds.” A copy of the ’^diagram referred to in the testimony of this witness is made a part of the record and embodied in this bill of exceptions.
John J. Wilson, another witness, testified “that he was present at the killing. When Mr. Curtis came in he was at the window in the front office, looking on Main street. Heard McGuire ask Mr. Uyon if Poindexter was in — McGuire came in first. Did not hear anything until I heard Poindexter exclaim to Curtis, ‘Stand back.’ Got up and saw no more until I saw them strike and shoot. Curtis struck first. Can’t tell the number of blows and shots. Heard Poindexter exclaim *598 ‘Good God, I didn’t want to kill the man.’ Heard him ask for some ice. I first got up and witnessed the striking soon after I heard Poindexter warn Curtis, ‘Stand back.’ I looked at it through the window in the nartition. The blows and firing were both rapid. Could not tell the number. I saw no one at this time but myself in the front office. I did not see Mr. McGuire except when he first came in.”
And thereupon the Commonwealth’s attorney introduced another witness, Francis H. McGuire, who testified, in substance, as follows: “I was present at the killing of Charles C. Curtis by the prisoner at the bar. It occurred on Monday. Cannot recall the date. It was in Richmond, Virginia, at the factory of John K. Childrey on Main street, about eleven o’clock A. M. Reaching the factory, Mr. Curtis and I were together. I opened the door on Main street and stepped in. I preceded Curtis. He followed immediately. I stepped up to Captain Allen M. Lyon who was sitting in the front office. I think his feet were on a stove. The office consists of 3 compartments. The first we entered. It is six by ten or twelve feet, I should say; may have been larger. I have never been in it before or since. The second office was cut off by a partition *from it. I went up to Captain Lyon and asked him where Mr. Poindexter was. Before I heard his reply I discovered that Mr. Curtis had seen Poindexter. Mr. Poindexter was behind a counter in the adjoining room, looking through a window. Mr. Curtis advanced to the window and saic[ to Poindex-ter, ‘I demand an apology for your conduct this morning.’ I am sure he said this. Whether he added, ‘full and immediate,’ I cannot say. I heard Poindexter’s reply. It was; ‘I won’t apologize.’ That is my recollection; but I cannot be certain about it. I still stood near Captain Lyon, who was still sitting, but I turned toward Curtis and Poin-dexter. Captain Lyon and I were both nearer to the door of the office in which Poindexter was than was Mr. Curtis, though not in a line between him and it. The demand was made, and the reply given through the window. I was facing towards Curtis. When I heard Poindexter’s reply, I said, ‘You must get in there,’ or ‘Get in there.’ Curtis passed to the door and I followed him immediately.”
The witness described the inner room-as follows: “It contains a long desk, extending its whole length, I believe on the side next to the first room. My impression is, the room is about the same size as the outer one. There are some pieces of furnitme on the opposite side. I am not certain whether it is a safe or desk. It may be both. _ I think there was a tall stool. My recollection about the stool is very indistinct, but as Curtis advanced into the room, my impression has always been that Poindexter got off the stool, with his left hand up, and his right hand at his hip. (Witness took the position.) I followed Curtis into the room. My object in following him was to prevent any interference. Curtis advanced with his stick raised, and I got further into the room — to see more distinctly. When Poindexter got off the stool and took the attitude *1 have described, I think Curtis faltered — hesitated. I heard him say, T am unarmed.’ At the same time he turned his head over his shoulder and cast an enquiring look at me. My impression is I could not see Poindexter’s right hand because of Curtis’ body being between me and it. I was aware a pistol had been drawn by Poin-dexter. I said in response to the enquiring look, ‘You must beat him,’ or ‘beat him.’ Curtis then turned his glance, immediately advanced, and struck Poindexter; and Poindex-ter fired; and the striking and firing continued until Curtis fell. My impression is five shots were fired. They were very close together; sufficiently close for one to belabor the other with a stick; _ for Curtis to strike him fairly and strike him well. Curtis fell rather on the left side of the office as he went in, and fell over to the left. Did not fall in a lump, but collapsed gradually. I caught him by the shoulders before his head touched the floor, I think. I then went out for a doctor. He never spoke after he was shot. He looked in my face with an expression of great pain. Curtis was about my' size. I weighed 125 pounds when I last weighed. I saw no marks or bruises on Poindexter. Had no opportunity to do so. Curtis 'had no arms to my knowledge. He made no effort to draw any. I could not say whether a lick was struck before the shot was fired. The two were very nearly" cotemporaneous I think. The witness here identified a hickory stick produced to him as that used by Curtis. Said he aided him in selecting it as they came down the street to Childrey’s factory. I thought there was also a negro in the office. I was the adviser of Curtis in this case. When Curtis turned his face to me they were not in striking distance of each other. He made the remark, T am unarmed’ before he looked at me, and then turned his head; when I ^replied, ‘You must beat him.’ He then turned immediately and attacked Poindexter. I looked at the wounds when Curtis was on the floor. My impression is there were three wounds on the left breast, and one on the right, and one over the left eye. When Curtis advanced upon Poindexter, his stick was raised. I think he advanced immediately with his stick raised, as he got into the room. Before he got within striking distance the pause occurred. My recollection is, that during the combat, Mr. Poindextsr retreated to the wall. That is to say, within a few inches of the wall, but whether he was there at the end I cannot say. The blows continued rapid, continuous and unremitting until Curtis fell. I saw no diminution in the force of them until he fell. After Curtis came into the door, Poindexter could not get out of the room except by passing Curtis. I think Curtis’ head struck nothing; it may have struck a piece o'f the furniture as it went down. Immediately after Curtis fell, Poindexter exclaimed in tones of great distress, T did not mean to kill the man, you all do what you can for him,’ or words to that effect. We gathered around him, and I went at once for a physician. *599 After I returned, I said, ‘We are all going to stand up to this thing and I had better get an officer of the law,’ and Poindexter told me' where I could get one, and I went and brought him. Poindexter was there when I returned. Meanwhile a policeman had come in and arrested him. I saw no evidence of Curtis having been struck until he fell. I saw no blows strike Poindexter elsewhere than on his raised arm. The parties were very close together when the shots were fired. Poindexter might possibly have passed into the rear room by the door opposite the one by which we entered, as Mr. Curtis was passing from the window to the door of the room in which Poindexter was; but to do so he must have *moved rapidly, and started immediately upon Curtis demanding the apology. I was nearer to Curtis than Mr. Lyon was. I was about 3 or 4 feet to the front and left of Mr. Lyon, and was the first to get to Curtis when he fell, and caught his head before it reached the floor. I was not armed. This is the first time I have ever stated this or been asked the question. I gave no intimation there as to whether I was armed. Poindexter must have seen me. I was conscious that Pom-dexter had drawn a weapon, though I did not see it, or hear the expressions, ‘Stand off/ or ‘if you strike me with that stick, I’ll shoot you.’ I gave the direction to Curtis to ‘hit him,’ or ‘beat him,’ as emphatically as I could, and when I did so was fully aware that Poindexter had drawn a pistol. After Curtis fell, I said ‘raise the window and let him have some fresh air.’ Mr. Allen M. Lyon said ‘You ought to have kept him in the fresh air when you had him there.’ I said T must be allowed to differ with you as to that.’ ”
Then the Commonwealth introduced another witness, William M. Colgin, who testified:
“I am a policeman. I made the arrest of Poindexter. Got to the office either 25 minutes after 11 o’clock or 25 minutes to 12 o’clock. Mr. Allen M. Lyons let me in. I asked who did the shooting. He told me it was Mr. Poindexter. I spoke to Poindexter and arrested him. He said he was the man. Asked me if I thought the man would die. Told him I thought he would. Asked for his pistol, and he ran his hand in his pocket and handed it to me. The pistol was exhibited. Poin-dexter asked me if I thought it necessary he should be arrested. Said he had sent for a magistrate and thought it could be settled there. Afterwards, Squire Judson Cunningham came and I got the cane and whip from him. Poindexter, in talking of it, said there would have been no occasion for the shooting if *it had not been for that man there, pointing to Mr. McGuire.”
Then the Commonwealth introduced Dr. William H. Taylor, coroner of the city, as a witness, who described the wounds upon the body and in the head of the deceased, and exhibited the bullets extracted from the body and brain of the deceased. He described the wound in the head as necessarily fatal. The wound in the right lung as not necessarily fatal, but very dangerous. And that none of the wounds but that in the head would necessarily have stopped the fight.
And then the Commonwealth introduced V. S. Carlton, who testified as follows:
“I knew the deceased; had been employed in the store of Wingo, Ellett & Crump with him over a year. The store is at the corner of Main and 10th streets; the store is about 30 feet long. In it are four counters, two on each side, set end to end with a break between for persons to pass. On the further end of the rearmost counter, on the left-hand side as you enter from Main street, sets the desk. On the morning of the 3d of March, 1879, about 8 o’clock, I went to the store. About 9 o’clock Mr. Curtis arrived, returning from his breakfast. About half-past nine o’clock a. m., Curtis was at the desk putting down the day of the month. I was standing near him. The prisoner and his brother Thomas came in.”
Here the witness was asked by the attorney for the Commonwealth to state what occurred after the Poindexters came in the store, avowing it to be his purpose to prove by the witness the particulars of an assault made then upon the deceased by the accused, in which the accused beat the deceased, and the defendant, by his counsel, objected to this line of interrogatory, and to the introduction by the Commonwealth of any evidence of an assault by the accused at that time, and to the ^particulars of any such assault; nevertheless the court overruled the objection, and allowed the witness to proceed as follows:
“His brother stopped near the door. Prisoner came up to where I was standing, and addressing me asked: ‘Is this Mr. Curtis?’ I said, T am not,’ and pointed him to Mr. Curtis. He then addressed Custis in a similar way, and Curtis said, ‘That’s my name.’ Prisoner then said, ‘You insulted a lady here on Saturday, who came here with Mrs. Crump.’ Curtis replied, T am not aware of it, sir; and if I did, I beg her pardon.’ Poindexter said, ‘You did, sir;’ and then drew a horsewhip from under his coat and struck him eight or ten pretty severe blows with it over his shoulders. Poindexter was standing in front of the counter and Curtis behind it when the striking began. Curtis stooped, raised his left arm, and proceeded along behind the counter towards the opening between the two. Reaching the opening, he came out into the aisle of the store, and told Poindexter ‘he would like him to explain. He did not know what it meant. He didn’t understand it.’ Poindexter said he had no explanation to make, and shook his fist in his (Curtis’) face. I never heard Curtis ask who the lady was. Then John E. Poindexter and Curtis walked towards the door to where Thomas Poin-dexter was standing, and the three went on towards the door together. I followed behind Curtis. I heard no more conversation between them. I think, in fact am pretty certain, although I will not swear to it, that deceased and Mr. John E. Poindexter shook hands before the gentlemen left the store. *600 The name of the lady was not mentioned at this time, nor did I hear Curtis at that time say he knew who the lady was. After the Poindexters left he seemed very much excited, and in about half an hour left. Between the time they left and his going *odt, he had been attending to his usual duties and overlooking some shoes. He went and was absent about half an hour. When he returned he told me he knew who it was. He did not call any names then. I did not ask him, nor did he tell me, how he got the information. Then he went out again, and I never saw him any more until I saw him at Mr. John W. Cringan’s, dead. He was about my size; might have been a little taller, but not so stout. -In my opinion he weighed from 120 to 125 pounds. I think the prisoner was taller than the deceased; cannot say what was the difference in their sizes. Curtis showed no disposition to fight Poindexter, or to return the fist-shaking by a blow. There was nothing to prevent his assaulting Poindexter if he had chosen to do so, as they went down the store together.”
To which ruling of the court in permitting said question to be asked and allowing the answer thereto to go to the jury, the prisoner excepted, and prayed that his bill of exceptions, (to-wit: the fifth,) might be signed, sealed and enrolled, which is done accordingly.
The same question, in effect, is presented by the fourth and fifth bills of exception, viz: Whether the occurrences which took place as before mentioned in the same city of Richmond, on the same day, to-wit: the third day of March, 1879, one of them at the store of Wingo, Ellett & Crump, at the corner of 10th and Main streets, at 9J4 o’clock A. M.; and the other of them at Chil-drey’s factory, corner of 24th and Main streets, between 11 and 12 o’clock on the same morning; there being an interval of about two hours between them; and the distance between the two places being fourteen squares —were so connected together and were of such a nature as that evidence of the former, which took place at the store of Wingo, El-lett & Crump, was admissible for the purpose for *which it was offered and introduced by the Commonwealth and admitted by the court, as mentioned in the fourth and fifth bills of exception aforesaid?
The court is clearly of opinion that the said occurrences were so connected, and that the said evidence was so admissible.
The interval of time between the said occurrences was very short compared with their importance — just two hours. The distance between the places where they respectively happened was fourteen squares of the city of Richmond. The parties were perfect strangers to each other when the first occurrence took place. Curtis seemed to be wholly unconscious of having given any just cause of offence in the matter for which the violent assault and'battery committed upon him by Poindexter on that occasion was so committed. He was not called' upon for an explanation or an apology in regard to the matter for which the said assault and battery was committed. He bore it without resistance and without a murmur of complaint. He even took friendfy leave of the perpetrator of it, and offered to anologize to the person who seemed to have taken offence at something which he was charged with having done or said on a former occasion, though he by no means admitted that he intended to give any such offence. Very soon after Poindex-ter left the store of Wingo, Ellett & Crump, after committing the assault and battery aforesaid, Curtis became very much excited and went out to enquire who 'it was that had done him so much violence, for he was then a total stranger to Poindexter. In a short time he made the discovery and returned; and soon again went out and with his friend McGuire went down to the place of business of Poindexter to get from him an apology for the great wrong which he had done to Curtis. They carried no deadly weapons with them. Neither *of them was armed, except that Curtis carried with him a stick, apparently of ordinary size, which they procuréd in their walk to see Poindexter. Curtis demanded an apology of Poindexter; and if it had been accordingly given, the whole difficulty would doubtless at once have been completely and peacefully settled. Certainly if Curtis would have been satisfied with such a settlement, as it.seems he would have been, Poindexter ought also to have been. But the latter refused to apologize, and the former had either to use his stick in striking Poindexter, or else to return as he came without receiving any satisfaction. Curtis advanced to use his stick, when Poindexter drew his pistol, which was a seven shooter, and threatened to kill Curtis if the latter struck him with the stick. The latter said he was unarmed, and seemed to doubt whether he would strike. But McGuire urged him to strike, which he accordingly did. And the striking with a stick on the one side, and' firing with a pistol on the other, continued until Curtis had received five wounds, one of which was mortal, though Poindexter seems not to have been seriously hurt by the.blows he received in the conflict.
Now the first occurrence aforesaid plainly led to, and was the cause of the second, as was well understood by Poindexter; and evidence of the former was clearly admissible evidence on the trial of Poindexter for the homicide of Curtis. The hustings court therefore did not err as alleged in the second assignment of error.
3. The third and last assignment of error is in these words: “The next error assigned is the refusal of the court to set aside the verdict and grant your petitioner a new trial.” This motion was based upon several grounds, and its refusal by the court forms the subject of the sixth bill of exceptions.
*The grounds on which the motion for a new trial was based, as above mentioned, are five in number, and are the following.
“First. Because the court erroneously ad *601 mitted as evidence to the jury the testimony of V. S. Carlton and of other witnesses concerning an assault made upon the deceased by the prisoner, between 9 and 10 o’clock on the morning of the day on which said homicide was committed; the prisoner alleging that said proof failed to show such a legal connection between the said assault and the subsequent killing as would justify admitting as evidence without limitation the said assault of the morning, and the particular circumstances attending it, and because the admission of said evidence operated to greatly prejudice the prisoner before the jury on said trial.
“Second. Because the verdict is contrary to the law and the evidence.
“Third. Because one of the jurors, O. J. Doggett, had formed and expressed, previously to his being summoned on the jury, such a decided and substantial opinion touching the guilt of the prisoner as disqualified him from being a competent juror.
“Fourth. Because two of the jurors from Fredericksburg, to-wit, J. E- Woody and George H. Peyton, Jr., were and are not competent jurors according to the Constitution and laws of Virginia, in this, to-wit: that neither they nor either of them are or were entitled to vote or hold office in their respective corporations at the time they were sworn upon and acted as jurors in the .trial of said cause; and grant him a new trial.
“Fifth. Because Richard S. Windsor, one of the jurors summoned from the city of Alexandria, is not now and was not a competent juror according to the Constitution and laws of the State of Virginia, in this to-wit: that he is not now and was not entitled to vote *or hold office in his corporation at the time he was sworn and acted as a juror in the trial of this cause.”
The first of the aforesaid grounds has already been fully considered and has been clearly shown to be unfounded. It was certainly not a good ground for setting aside the verdict and granting a new trial and will therefore be dismissed from further consideration.
The fourth ground alleged for said motion will be next considered, following the order pursued in the petition for a writ of error in this case, to-wit; that J. E. Woody and George H. Peyton, Jr., two of the jurors who tried the accused, were not competent jurors according to the Constitution and laws of Virginia, in this, to-wit: that neither they nor either of them are or were entitled to vote or hold office in their respective corporations at the time they were sworn upon and acted as jurors in the trial of said cause.
Without considering whether the two jurors above objected to as incompetent were in fact incompetent or not when they were accepted and sworn and served on the jury, it is sufficient to say that no objection was made to them or either of them by the accused until after a verdict of guilty was found against him by the jury; when, for the first time, an objection was made to their competency by the accused, by making it the fourth ground, which we are now considering, of his motion to set aside the said verdict and grant him a new trial. The court is of opinion, that the said objection was made too late, and was then properly o-verruled. The accused accepted these two jurors; had the benefit of having them on the jury which tried him; and being disappointed by the verdict of “guilty” which was found against him, he then, for the first time, objected that these two jurors were incompetent as such because they had not paid their capitation tax for 1878, the year preceding that in which the trial *took place. The proper time for objection to the said jurors was before they were sworn on the jury. No such objection was then made. The only objection made by the accused to the veniremen or any of them summoned from Alexandria and Fredericksburg, was by a motion to quash both of the two writs of venire facias under which they were summoned and the returns thereon for alleged errors and irregularities apparent upon the face of them; which motion the court overruled. And of the veniremen so summoned and attending, a panel of sixteen qualified jurors, free from exception for the said trial was completed, and the prisoner having stricken from the said panel the names of four of the said jurors, the remaining twelve constituted the jury for the trial of the prisoner, by which he was accordingly tried and found guilty; after which, for the first time, he made an objection to the jurors in question. If he did not know whether they had paid their capitation taxes of the preceding year, and cared about availing himself of any such ground of objection, if it existed, he could easily have enquired into it of them or otherwise before they were sworn, and then acted accordingly. But he made no such enquiry; doubtless because he cared nothing about it; or preferred to have the benefit of the objection, if he could make it in the event of. a verdict being found against him. By the Code, ch. 158, § 20, it is provided, that “no exceotion shall be allowed against any juror after he is sworn upon the jury, on account of his age or other legal disability unless by leave of the court.” The principle of this section, is applicable alike to civil and criminal cases. Certainly no such exception can be allowed after verdict. It matters not whether the ground of exception be constitutional or legal. In either case it may be given up by the party entitled to the benefit thereof. An if *not made before verdict it will be considered as having been given up.
The court is therefore of opinion that the said fourth ground for said motion is not well founded and must be overruled.
The fifth ground alleged for said motion, to-wit: the incompetency of Richard S. Windsor as a juror, seems to have been abandoned by the plaintiff in error, as no notice is taken of it in his petition for a writ of error, which seems to have been because the capitation tax which he had failed to pay was that of 1877, and not that of 1878, the year next preceding the trial; and so the case was not *602 one of incompetency, even on the ground relied on by the plaintiff in error.
The third ground alleged for said motion, following the order aforesaid, will next be considered, to-wit: “Because one of the jurors, O. J. Doggett, had formed and expressed^ previously to his being summoned on the jury, such a decided and' substantial opinion touching the guilt of the prisoner as disqualified him from being a competent juror.”
. O. J. Doggett at the time of the trial, resided in Fredericksburg, and was one of the jurors summoned from that town. So far as the record shows, he is a gentleman of high character, and had no prejudice whatever against the accused, but on the contrary knew him well and was friendly towards him. The court certified that the said Dog-gett when examined on his voir dire, on the 31st day of April, 1879, answered the questions put to him as follows, to-wit:
“To the court: I cannot say I have formed a substantial opinion; have read the evidence; have no prejudice against the prisoner; have no substantial opinion: only read the newspaper accounts, and could not form a positive opinion. Am satisfied I can give *the accused a fair and impartial trial. Plave no conscientious scruples about inflicting capital punishment.”
“To prisoner’s counsel: Have read the evidence disconnectedly, not studiously, or with care. I may have an impression, but have no opinion. That is, I have not any fixed opinion.”
• And thereupon the juror was accepted and took his seat in the jury box.
After a verdict was found by the jury, a motion was made by the prisoner to set it aside, and the third'ground on which said motion was made, as we have seen, was that said Doggett, one of the jurors, had formed or expressed, previously to his being summoned on the jury, such a decided and substantial opinion touching the guilt of the prisoner, as disqualified him from being a competent juror.
The testimony of several witnesses was taken before the court uoon this question and forms a part of the record. On behalf of the Commonwealth the testimony of the juror Doggett was taken, and on behalf of the prisoner was taken the testimony of George E. Chancellor, John R. Dickerson, and E. D. Cole. Without setting out this testimony, or even the substance of it, it is enough to say that it affords no sufficient ground for setting aside the verdict and granting a new trial in the case. The statement of the juror upon his voir dire, supported as it is by his own testimony, counterbalances the testimony on the other side, and shows that he was a competent juror and trustworthy as such.
The court is therefore of opinion, that the said third ground for said motion is not well founded and must be overruled.
It now only remains to consider and dispose of the second ground relied on by the prisoner in support of *his motion to set aside the verdict and grant him a new trial; which is,
“Second. Because the verdict is contrary to the law and the evidence.”
Besides the evidence which has already been substantially set out in this opinion, being the testimony of the witnesses Allen M. Lyon, F. H. McGuire, William M. Col-gin, Dr. William H. Taylor, John J. Wilson, and V. S. Carlton, the Commonwealth then introduced another witness, Wilson Price, who is a shoemaker at Wingo, Ellett &. Crump’s, and was present in their store when the occurrence took place there between John E. Poindexter and Curtis,, as hereinbefore narrated. His account of that transaction corresponds, substantially, with that hereinbefore given.
The Commonwealth’s attorney then exhibited to the jury the cane used by the deceased. It is a hickory stick two feet nine and one-half inches in length, and about three inches in circumference at the large end, and two inches in circumference at the lower end, with several prominent knots upon it, and a ferrule at the end, and the skin upon it about midway was split for about six inches. It had the apoearance of being new. The pistol is a pocket pistol of Smith & Wesson’s make, carrying seven balls. Six of the barrels had been discharged, and one barrel remained loaded. The.pistol and whip were also exhibited to the jury.
And the Commonwealth thereuoon rested.
Whereupon the following testimony, substantially, was introduced for the defence:
Bazil Gordon testified: “I witnessed a portion of the difficulty at Wingo, Ellett & Crump’s store. I went in there about nine o’clock in the morning. I recognized four gentlemen, and saw Mr. John E. Poindexter shake his fist in Curtis’ face, and say, ‘I’ll teach you how to behave to ladies.’ The parties went towards *the door. Curtis said he would apologize to the lady. Poindexter said the lady should never come into the store again — that she should not speak to Curtis nor he to her. Curtis said, then he would apologize to him. Then they shook hands and. the Poindexters went out of the door. My impression from what I saw was, that the affair was over. I saw no blows. I did not pursue the matter or make any further enquires about it. I think Curtis extended his hand and Poindexter grasped it. This was near the door as they were parting.” I “had known Mr. Curtis very well. Left the store in half a minute after handing Curtis a shoe. I thought Curtis was excited when I had the conversation about the shoe with him. Knew both parties, one about as well as the other.”
Thomas Poindexter, another witness for the defence, and a brother of the accused, then fully testified as to the occurrence which took place at the store of Wingo, Ellett & Crump as before mentioned. Before he did so he stated that he and his brother lived together at No. 1104, Broad street. “Saw brother the night before the difficulty. *603 He came home about 13 o’clock at night. I was about to retire. Soon after he came in, he asked me if I knew a man by the name of Curtis, at Wingo, Ellett & Crump’s. I replied I did not. He then said he had grossly insulted Miss Cottrell, and went on to tell me the particulars of the insult,” which were related to him by Miss Cottrell, and need not be here repeated. “He seemed very much excited, and thought her very grossly insulted. He then said, T will go down there and see that man, and demand a written apology, and if he declines giving it, I will thrash him or horsewhip him; I don’t know which. Asked me to go with him, simply to keep any one else from attacking him. I said I would. Next morning I started from home, on my way down *town to my office, and had got beyond the yard gate. Brother came to the front door and called me. He came up with me and said, ‘I reckon we had better see that man this morning.’ We walked through the capitol square. On the way he said, ‘I think that fellow deserves a whipping, and I think I’ll whip him.’ When we got to Wingp, Ellett & Crump’s store, brother went on ahead of me. On entering, I noticed three persons, Mr. Carlton whom I knew, Mr. Curtis, and a negro in the back part of the store. Mr. Carlton and Mr. Curtis were at or near a desk, resting on the further end of the counter, on the left-hand side of the store as you go in. Brother walked up to where they were standing, and asked, ‘Is Mr. Curtis here?’” &c. He then proceeded to detail what transpired on that occasion, and his statement on the subject corresponds substantially with the testimony of the other witnesses on the same subject, which has been already referred to. He testified to one expression of his brother on that occasion which is not mentioned in the testimony of either of the other witnesses. He said that, “As he, (Curtis) came from behind the counter brother nearly met him, and said, ‘Damn you, I’ll teach you some manners.’ ”
After stating what occurred in the store, the witness said: “When we left the store, I was satisfied the difficulty was ended. Curtis did not tell my brother he would apologize before he struck him. No demand for an apology was made,” &c.
Isabella Cottrell, another witness for the defence, then fully testified in the case. She detailed what she said occurred between Curtis and herself, on three different occasions on which she visited the store of Wingo, Ellett & Crump, in January and February, 1879, for the purpose of buying or exchanging shoes, or having them fixed or repaired; and she complained *of what she said he did or said on two of those occasions, the first and the last, which she characterized as impudent; the most objectionable of which seems to have been, that on helping to get in the phaeton, in which she rode to and from the said store on the last of said three occasions, in company with her aunt, Mrs. Bowles, he squeezed her arm. She said: “This occurred bn the Friday before the tragedy. I saw Mr. Poindexter the Sunday afterwards. He drove out to my house*, and sent a messenger up stairs to know if I would like to drive with him up the country to my brother’s. He was going to his farm, and then to my brother’s, who resided about ten miles above the city. I went with him. On the way up, I related the circumstances which took place at the store. I then related all except one thing, about the young man squeezing my arm, which I told him afterwards at home. He expressed his indignation at such conduct. I do not remember how, but very freely. Webothagreedhe had beenveryrude. We stopped at his farm a short while, then drove to brother’s. Found no one at home except tv?o gentlemen who lived with brother, and returned home directly. 1 reside with my ■brother-in-law, Mr. Alvis, about one mile from town, near the new reservoir. He spent the afternoon and evening with me. I think it was in the evening just before tea, we were sitting in the parlor together. I occupied a rocking-chair just immediately in front of the fire, and I think he was sitting to my left. He took up a book I had been reading, in which was a letter of mine; and I remarked to him, that he should not read that letter. He said that he would, and I told him that he should not, and attempted to get the letter from him. He held the letter off from me in his left hand. I started to grab it, and at the same time I got up. When I did so he caught my arm and made me *sit back in the chair. Then I turned to him and said, that reminds me of some more of that young man’s impudence at the shoe store. Then I said to him, ‘He squeezed my arm in a very ungentlemanly manner when 1 got into the phaeton.’ He had been laughing and in a very good humor before, but I noticed his expression changed immediately, and he said to me, ‘He did?’ I said, ‘He did.’ I noticed he was very angry when he said to me, ‘I’ll horsewhip that fellow.’ He said, ‘What day were you at the store?’ T replied, ‘East Friday.’ Then he asked me for a description of him. He said, ‘Is he a bigger fellow than I am; for if he is, I might be afraid to attack him?’ I said, ‘You are Taller, but T expect that he is the heavier, and probably the stronger of the two.’ That was the impression I -had of the young man. Then I turned to him and said, ‘Give me my letter.’ He said, ‘I won’t do anything of the kind; T intend to read it,’ in a jocular manner. Then the tea-bell rang and nothing more was said on the subject. Nothing else ever passed between us on the subject. He left my house about 11 o’clock P. M., or just before that hour. I think it was between 3 and 3 o’clock the next afternoon I heard of the occurrence from Mr. Thomas Poindexter. When T first saw him I was very much excited, for I knew something very unusual had occurred to bring him to my house at that hour of the day. He was not in the habit of visiting me, and I could not conjecture the object of his visit. What Mr. John E. Poindexter had said the evening before about his purpose Jo attack Mr. Curtis, had made no impression upon my mind, and I did not think he intended to carry out his threat. Have known the pris *604 oner ten years.” Being asked the direct question, she admitted she was engaged to be married to the *prisoner, and had been for two years, and that he visited her two or three times a week regularly.
In her cross-examination, the witness, among other things, said “I did not carry on a smiling conversation with Mr. Curtis. I tried to show him by my manner that his conversation was offensive. The head of the horse attached to the phaeton was turned up the street; Mrs. Bowles was driving, and on the side next to the store. In getting in I had to step across her feet, so as to sit on her' left. Mrs. Bowles had thrown the reins down, so I got in without difficulty. He helped me into the phaeton. It was a very low phaeton. The peculiarity of what he did when he helped me in, consisted in the manner in which he squeezed my arm. I think Mr. John E. Poindexter and I rode together 24 or 25 miles. I said nothing about his squeezing my arm until just before tea,.”
The witness made other statements in her examination-in-chief and cross-examination, which however need not be repeated .here.
Dr. J. S. D. Cullen, another witness for the defence, testified: “I saw John E. Poin-dexter about 2 hours after the killing. Summoned to see his arm, and went to the station house. He exposed his arm and showed the injury. On the left arm he had a bruise, and considerable swelling at the junction of the arm and wrist. I pushed up his sleeve, and found the lower flat surface of the arm quite red and bruised. The flat portion of the arm had been exposed entirely. I expressed the opinion at the time, that if the angle of the bone had received the blows, they would have fractured it. Prisoner has quite a small arm. The swelling at the wrist was, say an inch in diameter. Two days afterwards, when I examined the arm, there was an abrasion upon the fleshy oarts the size of the *end of your thumb, with the skin broken. No bones were broken.”
Several witnesses on both sides were examined as to the size and weight of the prisoner and deceased respectively, from which it appears that'their size and weight were about the same.
The following witnesses were sworn, and testified to the excellent and unexceptionable character of the prisoner for peaceableness and as a good citizen prior to the homicide, to-wit: Charles F. Taylor, Thomas H. Norward, Rey. J. G. Armstrong, John H. Tyler, William H. Powers, Thomas M. Alfriend, Rev. E. W. Warren, E. M. Alfriend, and James A. Richardson.
John Nagle, another witness for the Commonwealth, was present on the occasion of the last visit of Miss Cottrell to the store of Wingo, Ellett & Crump, and testified to what took place between her and Curtis on that occasion; but the testimony of that witness need not be set out here.
Then Mrs. Bowles was introduced for the defence, and testified as follows: “I went to the store of Wingo, Ellett & Crump on the 28th of February, 1879, with Miss Cottrell. Am a sister of Mr. Crump of that firm. We rode in a phaeton. I did not go into the store. She made complaint of treatment received in that store. She said she was highly indignant; that the treatment had been received at the hands of Mr. Curtis. Her manner was that of a lady who felt herself greatly aggrieved by the treatment she had received. She made the statement immediately on entering the vehicle on coming out of the store. She told me all about it immediately on our starting out. I was not in the store at all.
And the court certified that the statements of the said witnesses, examined on the said trial, as thereinbefore *set forth, contained all the material facts proved on the trial of the said cause.
The question now is, whether the verdict of the jury, finding the said John E. Poin-dexter guilty of voluntary manslaughter, and ascertaining the term of his.confinement in the penitentiary at two years, is contrary to the law and the evidence?
The law which-governs this case seems to be very plain, and to afford no room for controversy. We have not, thus far, found occasion to refer to any legal authority on the subject, and it is not probable that we will in the course of this opinion. Such is the protection which the law affords to human life, that it will not permit it to be taken for “the purpose of self-defence, unless the person taking it have a well grounded apprehension that he is in danger of losing his own life or of suffering grievous bodily harm, and a well grounded belief that such danger may and can only be averted by taking the life of the person from whose act the danger is apprehended.
Now is this such a case as the one stated? The life of the deceased was taken by the accused; and taken by the use of a deadly weapon; by shooting him five times with a pistol; shooting him until he fell down dead by his side. The accused certainly intended to kill the deceased. Was it necessary for him to do so, to save his own life or avoid grievous bodily harm; or had he a well grounded belief of the existence of such a necessity? What are the facts of the case?
About two hours before the homicide was committed, and on t-he same day, to-wit: at o’clock on the morning of the 3d day of March, 1879, the accused, who was a total stranger to the deceased, called at the shoe store of Wingo, Ellett & Crump, at the corner of Main and 10th streets, in the city of Richmond, in which store the deceased was employed, and gave him *8 or 10 lashes with the horsewhip, because, as the prisoner alleged, the deceased had insulted a lady who had shortly before been dealing with him at the store in which he was employed. The deceased denied at the time that he had given such insult, and declared his willingness, if he had done so, or was supposed to have done so, to apologize to the lady, or to the accused in her behalf, for the insult or , supposed insult. The deceased then did no violence to the accused in return for the violence *605 thus committed by the latter upon him; did not resist such violence; bore it patiently; and did not do one harsh act or speak one unkind word, to or of the prisoner or anybody else. The brother of the prisoner went with him to the said store, and was present when the said violence was committed. He went by the prisoner’s request, to help to defend him, if necessary, against any return which might possibly be made of the intended violence. After the prisoner and his brother left the store of Wingo, Ellett & Crump, the deceased, who seems to have been greatly shocked and astounded by the treatment he had just received, was very much excited, and no doubt mortified on the subject, went out of the said store and into the streets to enquire who it was that had treated him so badly, and where he could be found. The deceased soon learned that the wrongdoer was the prisoner, who was then employed at Childrey’s factory, corner of Main and Twenty-fourth streets, in the city of Richmond, just fourteen squares from the said store of Wingo, Ellett & Crump. The deceased then went down at once to see the prisoner on the subject of the violence just committed by the latter as aforesaid, and carried with him his friend McGuire; no doubt for the same purpose for which the prisoner had carried his brother with him to the store of Wingo, Ellett & Crump as aforesaid. On their way they procured and carried *with them a stick of ordinary size and character, no doubt to be used in endeavoring to obtain redress and satisfaction only in the event of the refusal of the nrisoner to make an apology for his violent treatment of the deceased as aforesaid. Neither the deceased, nor his friend McGuire, was armed with a firearm or dirk or knife, or any other weapon than the stick aforesaid. When they arrived at the said factory, which was about 11J4 o’clock, just two hours after the commission of the violence at the store aforesaid, they found the prisoner in an inner room of the factory, at a window in the partition between that and the outer room. The deceased approached him there, and said he wanted an apology for the conduct of the prisoner towards him as aforesaid. The prisoner replied, “You can’t get one.” The deceased then went towards the door of the other room in which the prisoner was, apparently for the puspose of using the stick against him if he should persist in refusing to make an_ apology. There can be no doubt that if the prisoner had made an apology, as requested, the difficulty would, at once, have been finally and satisfactorily settled; and the deceased and his friend McGuire would have returned home,without ever go;ng into the room where the prisoner was. The deceased, though he had just received very violent treatment from the prisoner without being permitted to make satisfaction by an explanation and an apology, which he would have done readily, and offered to do; was willing, and so declared to. the prisoner, to receive an apology from him in satisfaction of the ininry so received: but the prisoner was unwilling, and positively declined to give even an apology. The deceased then, with his stick upraised, approached the prisoner, as if to strike him, and then stopped. The prisoner had his pistol in his hand, and said, “If you strike me with that stick I *will shoot you.” The deceased remarked, “I am unarmed.” The prisoner again said, “If you strike me with that stick I’ll shoot you— I’ll shoot you.” McGuire then said, “Hit him, hit him; knock him in the head, knock him in the head.” The deceased immediately advanced and struck him — the prisoner firing; the striking and firing continued until the deceased fell. He died, almost immediately, of the wounds he received on that occasion. There were three wounds on the left breast, one on the right, and one over the left eye. Four balls were found in his body.
Now all this might have been easily avoided by a mere apology; which, it seems, would have been reasonable, and even creditable to the prisoner. Ought it not to have been readily given, especially when by giving it the life of the deceased would have been saved? Can the taking of that life be regarded as an act of necessity when it could have been so easily avoided?
But it might easily have been avoided even without making an apology. The deceased and his friend McGuire were wholly unarmed, except with the stick aforesaid. They were alone in the factory; with nobody around or near them to render them any help in case of a personal conflict— while the prisoner was at his place of business, surrounded by his friends, who were ready and able to help him, if necessary; and would certainly have protected him, if necessary, from any injury in such a conflict. He was about an equal match, in size and strength, for the deceased; and might no doubt easily have obtained a chair or other thing in the room where he was, to use against the stick if necessary. Or, if he could not, his friends around him would not have tolerated the infliction of more than one or two blows upon him bv the deceased, *which would have clone him little or no hurt. If he had closed with the deceased, as he might have done, and not used his deadly weapon, would he not thus have avoided any serious injury, either to his person or his reputation? And ought he not in that way, if necessary, to have avoided the occasion of putting a fellow mortal to death?
The court is therefore of opinion that the verdict of the jury is not contrary to the law and the evidence. And upon the whole the court is of opinion that there is no error in the judgment of the hustings court of ihe citv of Richmond, and that it must be affirmed.
Judgment affirmed.